Case number 17-7071, Rhonda L. Davis et al, Stephanie L. Alston et al, appellants, v. District of Columbia. Ms. Smith for the appellants, Ms. Johnson for appellate, District of Columbia. Thank you. Thank you. Thank you, and may it please the Court, Rachel Smith for plaintiffs. I'd like to reserve three minutes for rebuttal. In 2010, defendant fired 115 workers, primarily low-paid African American social service workers. Defendant then replaced many of these workers' jobs with a new position that was substantively the same, but required a bachelor's degree, preventing many of them from reapplying to get their old jobs back. The District Court must be reversed because it made multiple clear errors of law. I'd like to address two today, the RIF and the degree requirement. First, with regard to the RIF, the District Court should have found that the plaintiffs made out their prima facie case because courts have established that in the Title VII context, a RIF is a particular employment practice, and plaintiffs have offered more than sufficient evidence showing that the RIF had a disparate impact on African Americans. A RIF is just a group of terminations, right? Yes, a RIF is. What would be left of the specific practice requirement if we said a group of terminations is a specific employment practice? So the Seventh Circuit's decision in Council 31 v. Ward is very helpful here, because here CFSA was forced to terminate a number of employees as a result of a severe budgetary shortfall and decided to target positions that had predominantly African Americans. Sorry, you said Council 3? Council 31 v. Ward. And then in Ward, the Illinois Unemployment Agency similarly was facing budgetary cuts and closed a number of offices and terminated employees in those offices. And those offices were predominantly in the Chicago area, which meant that those closures had a disproportionate impact on African Americans. And the Seventh Circuit held that that single layoff decision was a particular employment practice. I thought they held not that the RIF was the employment practice, but the decision to concentrate the layoffs in offices that were disproportionately African American. That's close, but not exactly. The Seventh Circuit held that the layoff decision was the particular employment practice. And similarly here, the court could conclude for several reasons that the RIF was a particular employment practice. Can you back up? Just define to me what you mean by the RIF. Imagine there's a memo that says, uh-oh, that comes from the mayor to the head of this agency, and says, uh-oh, budget problems. You, like every other agency in the city, must reduce staff by 5% through a RIF. Is that an employment practice that could have a disparate impact? Yes, the layoff. That doesn't lay any individual off. That just says 5% have to go. Nobody knows who those 5% are going to be. Is that what you're saying is a disparate impact? Or it seems to me what naturally happens is someone then goes, well, how are we going to pick those 5%? And they come up with a rule, a variety of rules, a plan of some sort, and that's the employment practice that may or may not have a disparate impact. Am I right? Yes, the layoff. Okay, so the RIF isn't the problem. It's the factor that's used to decide. It's the element or elements that are used to decide who is going to be on the chopping block for the RIF. So following the Supreme Court's decision. Don't start a case law yet. Just tell me, am I right about that in my understanding? You are right that the decision to lay off employees. No, not the decision to lay off. The decision as to which employees get laid off. That's what I'm asking. It seems to me that's what can cause a disparate impact. That is true, although Title VII to identify a practice as, like the particular employment practice, which is distinguishable, of course. Well, it has to be the practice that causes the harm. And the only practice that can cause the harm, in my view, would seem to be the decisional factor that says who gets laid off. Now, sometimes a RIF could say, could include, we need to cut by 5%, get rid of all the new hires. And so then the RIF would include the standard for whose jobs are going to get cut. And so then you would attack that standard that's included in the RIF itself. But it's got to be that differentiating standard that says who loses their job that is the relevant employment practice. Isn't that right? That is right, although Title VII does allow plaintiffs following Watson to identify a practice because the decision-making underlying that practice may be undisciplined and subjective. Is that your position? I'm sorry, Ms. Smith, I didn't mean to interrupt you. Is that your position that the way this RIF was implemented was through a group of essentially subjective practices? Yes, the evidence does show that the decisions as to whom to terminate were made by the director in consultation with other managers. But ultimately, the director subjectively made the decisions as to whom to terminate. And, in fact, the deputy director for administration explained that, quote, no single uniform criteria, test, or requirement was used in determining whom to lay off. So before us, you're trying to fit this case within Watson, I assume. Yes, there are genuine issues of material fact. But it seems like you took the opposite position below, where you said the RIF was not the result of subjective decision-making. So that section of the opposition to the motion for summary and judgment was explaining that two cases that the defendant had cited, Pickwick and Combs, both of which were ADEA cases in which plaintiffs were laid off on their merits. Defendant had decided to fire them because they were not performing adequately or they'd become obsolete. So plaintiffs were attempting to explain that those cases don't apply here because the plaintiffs were, in fact, told that the RIF did not reflect on their performance. It was simply carried out due to the budgetary shortfall. And I had a question about the way that the plaintiffs framed the claim here, and it's puzzled me, that it seems like the practice here was effectively the combination of terminating 70-odd employees and then at the same time bringing on 40-odd employees. So there's this notion that, well, we have to cut, but really it's a cull and just kind of a shift in the composition of the workforce through the imposition of the college degree requirement. I was curious why or whether that is part of it. Why it isn't or if it is. So what is the target of your challenge? The target is the layoff decision because that was what approximately caused the plaintiffs to lose their jobs. And defendant originally emphasized... And then separately you have another claim challenging the college degree requirement in hiring. Exactly. So because plaintiffs have met their prima facie duty to identify the RIF as a particular employment practice, just to be clear, I want to make sure we all know what that means because just calling it the RIF doesn't help me for what it's worth. It may help the others, but not me. Is your position that what you have shown is that there was a decision to adopt a subjective ad hoc decision-making process as to how they were going to implement this job reduction, needed job reduction, and is that decision to adopt and allow a subjective ad hoc decision-making process that is the practice you are challenging in this case? The practice that plaintiffs are challenging is the layoff decision and the way that in Watson the plaintiffs challenged... In a disparate impact case, you have to decide the practice that has the disparate impact. And you're saying just the decision to get rid of 15% or 10% or whatever employees, that is the factor? So it's an objective factor or is it a subjective factor as to how they said we're going to meet that target? You seem to be going back and forth and I really need to understand which one you're relying on. So because of the nature of the record, because defendants have both explained that they laid the plaintiffs off due to a severe budgetary shortfall and that they subjectively decided which positions to terminate, plaintiffs have two explanations, both of which courts have relied on in Title VII cases, showing that regardless of whether a reasonable juror found that this was simply a facially neutral practice or whether it was an undisciplined and subjective practice, that this does meet the Title VII requirements. Well, it can be both. It can be both, right? It's a facially neutral practice in the sense of we're going to eliminate whatever 5% of positions and then the criteria that we're going to use in culling those people is a set of subjective decisions. Yes, it can be both. And isn't that what you're arguing here? That it is those two things. The riff is we're going to laugh up a lot of people and rather than saying we're going to do that by reverse seniority or we're going to do that explicitly by who does and doesn't have a college degree, instead we're going to do it in some sort of hidden amalgam of subjective case-by-case decisions. I thought that was your position. Yes, and both fit within prior precedent that establishes that regardless of how a reasonable juror interpreted the evidence, the riff does meet Title VII criteria. The decision to terminate people is a practice with disparate impact. So what about a company says we need to hire 10 people? Can that be a disparate impact? Can you challenge that as having a disparate impact? Or do you have to look at the deciding factor they used in deciding whom to hire to challenge as a disparate impact? Is your question... If I said I'm putting an ad in the Washington Post that says we plan to hire 10 people, please apply, could that ever have a disparate impact? Just that, just that decision to hire. I don't believe so. Then how can the decision just to fire? We need to get rid of 10 people. How can that have a disparate impact? Because Title VII exists to prevent employers from firing or otherwise taking adverse employment actions against them. It applies just as much to hiring decisions. You can't differentiate hiring. Sure, it definitely applies to hiring decisions just as much as firing decisions. Of course, and if the employer used some sort of criteria in the hiring that had an adverse... Bingo, bingo. And so that seems to me like it's not the decision just we got to cut somebody. It is do they use some criterion or practice. And that, as I understood it from your argument here at least, is the subjective ad hoc approach. That's the target of the disparate impact analysis here. Yes, that's correct. As the plaintiffs in Watson did, we're challenging a practice that was carried out in an undisciplined and subjective way. And moreover, this practice had a clearly disparate impact on African Americans. The agency fired 18.2% of its African American employees but just 4% of its white employees. Now, the statistics looked at, treated all positions in this agency as equally subject to termination. But I took it from your brief that you didn't dispute that, in fact, that was inaccurate because there were certain positions that were never going to be on the chopping block, some that couldn't be as a matter of law as a result of court order or legislative requirement. Do you dispute that? So, yes. Your position is everything was equally vulnerable. Plaintiff's expert did take into account that the 30 employees in the financial division could not be terminated. Are those the ones subject to the consent decree? The SPAT declaration counted them, but the Davidson declaration later clarified that they were not actually under the CFSA control. My understanding is your statistics did not account for the consent decree. Is that mistaken? I see that my time has run out. You can keep going. So, defendant explained that the social workers were, quote, effectively precluded from being included in the RIF. Although LeSean didn't actually prevent social workers from being fired, it did have requirements that social workers not have over a certain number of active investigations, and it set out a number of timeliness and adequacy requirements for the agency to meet. So there has to be a number out there of how many investigations on average D.C. has each year so you can compute from that order that there has to be a certain number of social workers. So it's not really quite right to say that the order does not require a certain number of social workers be in place. But defendant's explanation is... Right, the order, unless D.C. is going to say we've got no cases this year, there's going to have to be a certain number of social workers that can't be fired. Yes, although defendant's explanation that social workers couldn't be fired seems to work against it here because the social service assistants and social work assistants who were fired were employees who had been helping the agency meet its timeliness and adequacy goals by... No, but I think the point remains that there were a certain number, that when they said, all right, who could be cut, they had to go, wait a minute, we have to set aside X number of people. They can't be touched. Now let's look at who's left. Although the question here is that looking at who was fired, the agency targeted almost mainly people in grades 7 and 8, which were predominantly African American. White employees are predominantly in grade 11 and above. The question here is why... So that sounds like the type of practice you could challenge was this was targeting grades 7 and 8, but I didn't understand your brief or at any point for you to be arguing or for your statistics to have shown that the problem here was 7 and 8 was the real standard. Let's get rid of people in those categories. And that, for reasons you're suggesting, has a racial disparity impact. The question here is why... Have you argued that before in this case? Plaintiff's expert did lay out the statistics as to grades targeted. The question here is why CFSA fired mainly social service assistants who were helping on a day-to-day basis, going out into the field to meet the LeSean mandates, instead of perhaps targeting management or other higher paid positions that were not so integral to meeting LeSean's mandates. The question of this case is not justifications or rationales. As I understand it, the case has been divided, and we're only talking about whether the showing of disparate impact has been made in the first instance. That's correct. So if your statistical analysis did not take account of positions that were not, how did you meet that burden? Plaintiffs did actually account for that, because as defendant's expert, Dr. Bronars, conceded on page 820 of the JA, on some level all positions were considered for the RIF. Dr. Bronars later went on to say it was not inappropriate to consider that at some point all positions were considered for the RIF. The question here is ultimately why CFSA chose to lay off. So it strikes me that the rationales that Dr. Bronars relies on in parsing the layoffs into different subgroups goes to the potential justification of the district, which is the second step into which no discovery has been had. Did you ever object in the district court to the reaching issues as to which plaintiffs have yet to have discovery? Was there any objection? I mean, I realize it wasn't you, actually, in the district court, but did counsel for the class in the district court ever make an objection? You can't decide those questions because those really go to the way that the employer says it has to structure its workforce, and that's the business justification part of the analysis. We haven't reached that. Plaintiffs mainly relied on their own expert, Dr. Monroe's testimony and statements in her reports, that it was the only logical approach to look at the disparate impact that the layoffs had agency-wide. And it is correct that Dr. Bronars' analysis puts the cart before the horse because it assumes that certain positions had to be laid off and just considers the disparate impact within those positions, when the question here is why CFSA laid off those positions. We haven't talked about the disparate treatment claim, and I know we've kept you up beyond your time. Judge Millett, I won't give you extra time for rebuttal. What evidence is there in the record that the bachelor degree requirement had a disparate impact? And again, I know you've received this case after the record was already built, but there is a problem, isn't there, in terms of whether there's record evidence to support the degree requirement, the challenge to the degree requirement? Yes, so plaintiffs are relying entirely on statistical evidence, and of course this court reviews the grant of summary judgment de novo and thus may take notice of census data. And census data here shows that the degree requirement had a large disparate impact on African Americans because in this area African Americans are over three times less likely to have a bachelor's degree. The Supreme Court in Griggs held that a high school degree requirement had a disparate impact where African Americans were also three times less likely to have a high school degree. So there were no statistics put into the district court record on this point? No, the census data was introduced. You're asking us to notice it on appeal? Yes, which Federal Rule of Evidence 201 does make clear. This court may do. You said you're relying only on the statistics for the disparate treatment claim. Again, why? So both the Supreme Court and circuits have made clear that in hiring cases, census data is inappropriate. I see your effort to bolster the claim. I'm wondering whether, I mean it seems to me just looking at this, that the district court, it was really quite an obvious error for the district court to rule on the evidentiary sufficiency of a disparate treatment claim without ever having permitted discovery on anything but the threshold showing. There wasn't any discovery allowed on intent, was there? The only discovery was on the statistics. That's correct. Did you ask for more discovery before summary judgment? Or your predecessor? Did the clients ask for more discovery before summary judgment or were they ready to go forward to summary judgment? This case was referred to the Howard Civil Rights Clinic. I just want to know whether the clients asked the district court for more discovery or not before going to summary judgment. Not to my knowledge. On the treatment claim, were you raising exclusively a pattern and practice claim under Teamsters or were you also trying to raise individual actions? No, this is a pattern or practice case under Teamsters in which the disparate treatment may be inferred from the statistics. Because plaintiffs have shown that the degree requirement had a significantly disparate impact on African Americans who might have wished to apply for the FSW position but for the discriminatory degree requirement, they have made out their prima facie claim. Thank you. Good morning. May it please the Court, Holly Johnson for the District of Columbia. Isolating a particular employment practice is essential to causation because as the Supreme Court has repeatedly informed us, it's the only way to establish that the employment practice caused a racial imbalance rather than a myriad of other innocent factors that could cause a racial imbalance. Indeed, Dr. Monroe's analysis was not at all based on the decision to abolish certain positions. Her analysis was based entirely on the termination rate, the ratio of African Americans separated versus the ratio of Caucasians separated. So there is no prima facie case as to the decision to conduct a writ. Now in this particular writ... Why isn't that relevant that African Americans were getting fired at quite a faster clip than Caucasians? In this case, why isn't that pretty powerful evidence? If you've got a writ that's agency-wide and twice as many African Americans are fired as Caucasians, why isn't that relevant evidence? It might be contested and debated and fought about. I would never suggest that it's not relevant. I would suggest that it's not probative because it's not statistically significant. And so it's hard to separate out sometimes the particular employment practice issue and the statistics issue, but I think it's helpful in these complicated cases to do so. You've got to. It's not just helpful. Otherwise, you can't show causation. Exactly. Yes, it's essential. That's where I was going with that, that it's essential to do that. But the problem here for them was, you've got to admit, D.C. was all over the place on what it was that they did for this writ. Well, it was budgets. Well, it was summary alignment. Well, it was ad hoc. Well, it was us looking one at a time. What are they supposed to do? I have to protest that strenuously. The record, it was the plaintiff's burden to establish a record. It was the plaintiff's burden to find out the reasons underlying the writ. There is nothing in the record suggesting that this was subjective, suggesting that it was undisciplined. What the record shows is a department was faced with a, I believe, $1.3 million cut it had to make in its personnel budget. And it then met with all of these different leaders within the agency, and they made many different decisions as to how those cuts could be made. Now, the fact that in the affidavit that was presented by the district at summary judgment doesn't go into grand detail about all of those different decisions that were made. It simply lays out the three service models. It does not mean that it's undisciplined. So I'm on JA 820, and this is the answer from D.C. on, you know, what was it that led to the writ? And it was, well, it was based on financial concerns, the reorganization concerns, the realignment of goals, different kinds of service models or the general points that I understand were the factors taken into account. And that seems to be when you look at the RIF itself, it's got on JA 330, it's got actually 331, reengineering and functions, lack of funding, and consolidation of positions. And then we're being told, well, I just pushed it down, and people did it individually. I just don't know how they're looking at this fairly significant disparity in termination rates. But D.C. is kind of a moving target as to the basis for its decisions. So what are plaintiffs supposed to do in a case like that? The plaintiffs are supposed to actually look into the documentation underlying the RIF. There's no evidence that they did that. I'm just telling you what the documents were that I saw. You've got better documents. No, no, no. That document, you're referring to the memorandum requesting authorization to conduct the RIF. Now, we know that they had to do it to resolve the budget concerns. And what they decided to do in order to continue to satisfy their court-ordered requirements. It's not just budget concerns. It's budgets and internal reengineering and consolidation of positions. I apologize. I didn't mean to interrupt. The internal reengineering is part of that process. What an agency does when an agency is faced with a budget cut, especially an agency like CFSA that has court-ordered requirements and statutory requirements, is they have to decide, how are we still going to get the work done? So what evidence did you put in the record of how many court-ordered and statutorily required positions there were that were just non-negotiable for purposes of the employment? I know there's references to it, but I haven't heard, and this could be my fault, I haven't heard what that number is. The evidence is in the record in the form of the organization chart in conjunction with the LeSean documentation. So we know, and there is, I introduced. Can you tell me what the number is? What the number is? I know, I put the numbers in my brief. It's 30% of the workforce, and my brief lists the number of case-carrying social workers that existed in the agency at the time and the number of case-carrying social worker supervisors. Those were the ones subject to the LeSean order. It comes out to 30% of the workforce. I went through the organization chart. That's the LeSean order? You also said that there were things required by legislation. Of course. I mean, the CFSA has functions that it has to perform. I'm just trying to ask you. No, no. I'm just trying to know what the total number. You can add LeSean and whatever your legislative requirements are. Where in the record is that number of how many employees could not even be considered for termination? I think where I'm struggling with the question is that there's sort of an underlying assumption that it was the district's burden of proof to do that. The district didn't introduce any. You're the ones who keep saying, look, that their statistics were wrong because there were all these positions. But you're attacking their statistics. This is your argument. I'm not making it up. Yes. That their statistics were wrong because there was X number of positions that were just never susceptible to the layoff. Am I fairly characterizing your argument on that point? As for the ones that were absolutely off limits, those are the case-carrying social workers, and we have provided those numbers. Otherwise, what we showed was that there were different decisions, different concrete decisions that went into the decision as to which positions to separate. That's a different matter. There are no other positions that we said were completely off limits. Okay, because you said by law and by court order. So, in fact, there's nothing. The only thing that was taking anything off the table was the LeSean order. Is that correct? As far as a specific position, yes. As far as functions that needed to be performed, and that's in the agency mission statement in the record. It refers to all the functions that needed to be performed. Now, I don't know that there was any one position that was specifically off limits because of that, and we've never argued that a specific position is. I'm just trying to figure out what you said when by law and by court order, and you just mean by court order. By court order, I mean positions. By law, I mean functions. And I hope that clarifies it because I did not mean to be unclear on that. Most people say we function better if we have less bosses in the way, so how come bosses don't seem to have been on the chopping block here? They seem to have been low-level folks. The case hasn't reached that point, and, frankly, the discovery needed to be conducted by the plaintiffs. There was no 30B6 deposition that was conducted. The problem is that the plaintiffs introduced an expert that simply assumed that all the jobs were equal and ignored the evidence that the district did provide that there were different decisions that went into the ultimate decision as to which positions to abolish. But that just seems to be saying that when they make out their disparate impact case, they have to accept your definition of the practice that caused the disparate impact rather than their own. Well, they have to conduct discovery and then put to the decisions that the court did. And that's why it was undisciplined and subjective when they didn't look into the decisions that were made. They did not ask how these decisions were made. They did not ask who made the decisions and which decisions were made by which managers and how were certain positions put on the block. And that is critically important to determining what the employment practices were, and that is the employee's burden. That is what the Supreme Court has specifically held. It specifically says, I know this is a heavy burden. We know that this is a burden on the employees, but we don't think it's fair to require the employer to come forth and try to explain the racial disparity when it could be based on all of these different factors. So what I've introduced in the court in my brief is the different things that could have caused the racial disparity that the employees didn't factor in. But Ms. Johnson, I thought that's where we started about 10 minutes ago with the answer to Dr. Bronars, who presumably was using the information that the district provided to structure his rebuttal to Dr. Monroe's testimony and the answer to the question of what factors would determine whether or not you were being subject to losing the job. And there were myriad factors given there in that answer. So they did ask what the bases were, the plaintiffs. No, the only thing that exists in the record as to the bases are the declarations of Portia Usher and the declaration of Davidson that lays out the different decision-making factors that were calculated in. Why doesn't the deposition we're reading from count as part of that evidence? The deposition of Dr. Bronars? Yes. Dr. Bronars was an expert testifying on statistics. He was not a district official, and he did not have personal knowledge of the information. Well, he's basing the bases for his statistical analysis, so someone had to tell him. He was also basing it on Davidson's declaration. And I will concede that with Dr. Bronars' analysis, there is some cart before the horse on that. But that's not the point. The point is that the employees have to produce statistical evidence of a disparity. It's not the district's burden to disprove it. So you're recognizing, then, that Dr. Bronars' statistics are not particularly helpful? I think that his testimony or his analysis was very helpful in pointing out the flaws in Dr. Monroe's analysis, but I do not think that he factored in the new service models or the LeSean factors either. I would agree with that. The district is not relying on Dr. Bronars' statistical analysis to establish its right to summary judgment. It didn't need to introduce any expert testimony at all. All that matters in this case is that Dr. Monroe conceded that her study's validity rested on her assumption that all jobs were equally at risk. She conceded that, and all jobs were not equally at risk. But why? I mean, I asked this question of Ms. Smith, but maybe it's really more appropriately directed at you. The district judge bifurcated consideration in the case and wasn't going to go into the question of the district's potential justifications for any disparate impact. But it does seem to me that the way Dr. Bronars is challenging Dr. Monroe's statistics is by saying, well, there were these various job-related reasons why the risks of discharge were different when different subcomponents of the agency. But that's something that the judge had predetermined, I thought, until later. So there's a way that that's sort of, as you say, getting the cart before the horse. Both of the experts went on at length, well, indeed, I'd say more so Dr. Monroe, about her skepticism about the reasons for doing the things the district did. None of that evidence was cited or referred to or argued in the briefs, and that's what the attorneys decide to bring forward. So, yes, there was discussion among the experts regarding the justification for the actions, but that's not really been litigated yet. Well, but the very notion that the fault or the flaw in plaintiff's expert's approach was that it should have been divided up in the way that the district's expert did. But my point is just that that division itself seems to be a division premised on various ideas that the district had a legitimate employment-related basis for treating different offices as differently subject to the RIF, and so it just brings forward that territory that the district judge had tried to leave untouched for later. Yes, I agree. I agree that it muddied the waters a little bit, but I will note that the attorneys, at least the district's attorneys, in arguing this case, were very careful not to step beyond those bounds. And there's a big difference between isolating a particular employment practice, which is the adoption of these service models, which everyone concedes took place, and affected the decision as to which positions to abolish. Nobody disputes that. The employees dispute whether it was necessary, whether it was a good idea, but you can isolate the fact of these decisions and the fact that these realignments affected which positions were abolished, which in turn affected the racial composition of the RIF. You can separate that from the business justification, which the district has never introduced. The district has not gone into its reasoning. It has not sought discovery yet on the reasons.  If we disagree with the district court that plaintiffs have failed to identify a practice susceptible of analysis under Title VII, whether because the RIF and the various decision-making criteria through which it was implemented are a specific practice, or because whatever practice the district had was not capable of further separation under the 1991 Civil Rights Act, if we believe that the district court was in error in saying there's not a recognizable practice here, then we don't really need to address the question about the statistics. We would send it back to the district court to do that. Oh, absolutely not. I believe that there's two factors here, because that was fully briefed. The district court didn't reach the question of the validity of the statistics, but that's not a discretionary question at this stage of summary judgment. It's de novo. It was fully briefed. If this court finds that the overall selection of positions for abolishment is a sufficient single employment practice and can be analyzed as such, then it needs to look at Dr. Monroe's analysis and see if it is possible for that to have probative value. And the Supreme Court and this court have repeatedly held that this is something that can be considered and should be considered at summary judgment. In Garcia in 2006, this court held the statistics to be probative, to even satisfy the prime evasion burden, must incorporate key relevant variables. Those LeSean factors, taking 30% of the workforce out of the equation, that's a key relevant variable. Her statistical analysis has no validity, because she did not consider that factor. And that's something this court can decide de novo and should consider de novo. Also, her failure to consider the retention standing of the employees. The difference in just the disparity, the racial disparity may well have been because once they decided the positions that could have been abolished, that African Americans tended to have a lower retention standing. That's not something that was within the control of the agency. That was a legal requirement that the agency had to comply with. I have concerns that Dr. Monroe keeps referring to managers as selecting employees for termination. That's not what happened. The agency selected positions to abolish, and then there's a whole regulatory process that determines which employees will actually be separated. So the failure to account for those factors, in itself, just invalidates her study. And I think that there are times where it could be a battle of the experts, but this isn't one of them. Dr. Monroe admitted that her study relied on her assumption that all positions were equally at risk. And the evidence is undisputed that positions were not equally at risk. And because it's such a large percentage, it takes all probative value out of her statistics. How can we factor in the plans? How can we tell how much that does or doesn't discount the statistics that Dr. Monroe relied on? The new service models? There is some that can be done with the raw numbers that are in the record, but the point is that the court can't. It's the plaintiff's job to produce that through an expert analysis, through multiple regression. And the raw data alone is not going to create a statistically significant number, and it's the plaintiff's burden to establish that. You said your brief here mentioned the 30% social worker positions that had to be retained because of LaShawn. Yes. Is that in the district court, that number, too, the 30%? The number is not in the district court, but Portia ethically referred to the need to comply with LaShawn and LaShawn. No, but that's new evidence, so we can't really. You can take judicial notice of what the court orders in LaShawn say, and I'm referring to court orders in LaShawn, and that's what I'm citing, too. But just to be clear, the record doesn't show whether the failure to factor in the LaShawn decision  If you don't have the number, you can't show that it may have gone down some, but it has to go down a lot to get past the four-fifths rule. If this court chooses not to take judicial notice, if we're looking just at the record, all we know is that Portia Usher said that that was part of the decision-making process, and no, the numbers are not in the district court. There needs to be a showing that whatever she omitted was statistically significant. If that wasn't established, I mean, the argument is she didn't cover, she made this assumption and in doing so swept in X number of positions that were never on the chopping block. But if no one ever filled in that blank and said how many positions there were and that that number rendered statistically insignificant the disparity she had shown, then it seems to me her statistics, taking the light, evidence in the light most favorable to the plaintiffs would still stand, would it not? No, I don't think it would. Because it's the plaintiff's burden to show that the evidence is statistically significant. And she herself, Dr. Monroe herself, acknowledged that she had not taken this into consideration. I get that, but imagine that this someone hadn't taken into consideration was two positions. Just imagine. I know that's not true here, but it was two positions out of 800. Then you go, okay, oops, I didn't take that into account. It would not take away the statistical significance of the study, correct? Correct? I think that's correct. Right. Every little error doesn't take away. I apologize. I know you're eager to say that. I know, I apologize. No, no, no, I get it. We're having a great exchange. So what's critical then is there had to be some, to take the evidentiary value out of her study, there had to be some showing that what she wrongly included was a statistically significant error. Well, the district courts, I agree with you that it's not in the actual, we introduced exhibits. But we referred to LaShawn in our briefing. We cited LaShawn in our briefing. The district courts cited LaShawn by docket number. No, I get that everyone said LaShawn, but if we don't know what the number is, I don't know what that tells us. But the number can be derived, and that is in the record. I mean, the number can be derived from the organization chart. But it wasn't. And so taking the facts in the light most favorable to the plaintiffs, how can we assume that if that math had been done and that we had rerun the statistics, it would take it out of statistical significant area? Well, I guess where I push back is on the idea that this specific 30% number needed to be in versus looking at, if you just look at the Office of Agency Programs, I mean, that's where this comes out of. That is the front running office that provides the front burner services, the Office of Agency Programs, and it is almost entirely consistent of case-carrying social workers, and that is plain from the record. That is in the record. But even if this court struggles with LaShawn, then let's look at the numbers that are in the record, because there are numbers in the record that are about specific employment decisions that Dr. Monroe acknowledged existed but did not calculate into her findings. She acknowledged that the assistants and associate positions, the ones that were completely eliminated, were 100% likely to be separated. But she didn't calculate that into her decision. She thought they were too homogeneous for her to get a statistically significant outcome from that, and so she didn't calculate that into her decision. We have those numbers in the record. We know that those abolishments alone made up for three-quarters, two-thirds or three-quarters, I'm forgetting, at least two-thirds, and we have the numbers in the record, of the people separated. Two-thirds, at least two-thirds of the people separated were separated based on an employment decision that is not the same decision as the other decisions regarding abolishment. The reason why the courts have focused so hard on isolating a particular employment practice in Title VII, even in its amendment, focuses on the plaintiff's ability to look at the elements of the decision-making process. The reason why is so that an employer is not up here in court trying to defend all of these different things that may be innocent. Ms. Johnson, can I ask you, just shifting gears slightly, you don't dispute, do you, that it was error under the Supreme Court's decision in Connecticut v. Thiel for the district court to hold that the college degree requirement could not have any disparate impact because of the bottom-line racial composition of the people hired? My dispute is whether that was really what his holding was. I don't dispute that had that been the holding, that would be error. Let me make that clear. Absolutely correct. You cannot do that kind of bottom-line reasoning. But his holding was that the plaintiffs failed to show any statistical disparity. The plaintiffs in their brief had two sentences devoted to this issue, and their entire argument was only a certain number, only 18 of the 150 separated assistants and associates were rehired. That was their analysis. So the court said, well, you've offered no evidence of a statistical disparity, and on top of that, there's no possibility of a racial disparity from what you have introduced because they were all African American. So yes, Judge Pillard, I completely agree that if that was just a straight-up holding, that would be error. But his holding was that there was no statistical analysis, and there was no statistical analysis. And I know my time is up, but I do want to address that because I think it's really important. I will be brief. This court held in Seeger that statistics on hiring practices must account for the minimum objective qualifications for the job. And aside from the degree requirement, the new family support worker position that was created required specialized knowledge in social work and in how child welfare agencies work. This was so important that if you weren't from within CFSA, you had to have a bachelor's degree in social work. There is no evidence, even if we accept the census data coming up on appeal for the first time, there's no evidence that the qualified labor pool had a racial disparity between those with a college degree and those without. What about the people who were actually fired? I mean, this is the same question that I asked Ms. Smith. It strikes me that the district, if you take as one practice the laying off of a lot of people as they're bringing other people on, that one might say that it was a cull using a college degree requirement, in which case the relevant pool would be the people who are already working there. I don't think that that's appropriate in large part because the college degree requirement is not the same thing as this new position. The employees are the ones that have decided that the new position is entirely based on the college degree requirement. That's one of the requirements. But they were going to create this new position, at least the evidence shows that this new position was created based on a new teaming model. It was a new model of service. But the evidence also shows that there's a virtually complete overlap between the requirements, the abilities required for the new position and the abilities required for the incumbent employees. So I want to make sure I'm understanding your question correctly because this isn't one I think that's come up yet in the briefing. You're asking what was in the briefing, just comparing what you needed to do for the eliminated position and what you needed to do for the new FWS, I think it was, position. There was a virtually 100% overlap between the things one needed to be able to do, the functions of those jobs. That I don't think is in evidence yet. Oh, yeah. No, no, the position descriptions are in evidence, yes. And Dr. Monroe's opinion, which should have been saved for Phase 2 of discovery, is also in evidence. But the reason why the district created the new position, the reason why they thought it was necessary, what the teaming model was, why they did the college degree, that all falls into the necessity side. The first thing that had to be done was to establish that the creation of that position, replacing a certain number of employees in these two positions with this new position, had a disparate racial impact. I will also note, because I think that this more quickly answers your question, although I think it's not necessary to answer your question, that if the qualified labor pool was just the people who were already working as assistants and associates, I believe that that's the group that was so homogeneous as to be entirely or almost entirely African American. So there's no way that there could be within that pool a disparity between those with college degrees and those without college degrees based on race. And that is essential for statistical analysis. All right, thank you. Thank you. Ms. Smith will give you two minutes. Thank you. This court is correct that defendants offered many different justifications for the RIF. And there is no evidence that any positions were categorically off limits in a way that would render Dr. Monroe's analysis less probative. This case is highly analogous to the DDC's decision in McReynolds v. Sodexo, where Sodexo argued that certain objective factors bound managers' hands in deciding whom to promote. But the evidence showed that, in fact, managers made those decisions entirely subjectively. And thus, because those decisions were made subjectively, that decision-making process was incapable for separation for analysis, and thus could be considered as one employment practice. Moreover, to switch gears and address the degree requirement, my colleague cites Seeger, but that is a promotion case. And in hiring cases, the Supreme Court has made clear that census data can show a disparate impact. And, in fact, in Hazelwood, in footnote 13, the Supreme Court made clear that where a job has requirements that simply are possessed by many people or fairly readily acquired, the general population is the relevant pool for comparison. Thus, plaintiffs have shown that the RIF had an overwhelming impact on low-paid African-American workers and have presented sufficient evidence, both with respect to the RIF and the degree requirement, to make out a prima facie case. Thus, this case must be reversed and remanded. Thank you. Thank you. The case is submitted.
judges: Millett, Pillard, Katsas